**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **IRA HARRIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 1:15-cv-140 SNLJ** |
| **vs.** ) | |
| ) | |
| **GARY KEMPKER, et al.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on multiple motions for summary judgment. Plaintiff, through his appointed counsel, has responded, and the motions are ripe for disposition.

## I.    Background

Plaintiff Ira Harris is incarcerated in the Missouri Department of Corrections ("MDOC").  Plaintiff, through his court-appointed attorneys, filed a third amended complaint (#126) on January 24, 2018.  This Court granted in part defendants' motion to dismiss certain defendants in their official capacities, but claims remain against the following defendants:

- State-employed individuals including former MDOC director George Lombardi, current MDOC director Anne Precythe, Potosi Correctional Center ("PCC") warden Troy Steele, Southeast Correctional Center

("SECC") warden Ian Wallace, PCC corrections officer David Null, and Missouri Department of Mental Health director Mark Stringer.

- Healthcare-related individuals and entities including the MDOC healthcare contractor Corizon, LLC, SECC health services administrator ("HSA") Brandi Juden, SECC Institutional Chief of Mental Health Cynthia Reese, SECC medical director John Eppolito, M.D., SECC nurse practitioner Nina Hill, and PCC medical director William McKinney, M.D..

The defendants have filed three motions for summary judgment: Document No. 161 by defendants Corizon, Juden, Eppolito, Hill, and McKinney; Document No. 166 by defendants Corizon and Reese; and Document No. 171 by the State defendants.

Plaintiff's claims involve two medical issues: his mental health and an anal fistula. The following facts are undisputed unless otherwise indicated.

**A. Mental Health Allegations**

Plaintiff was diagnosed with schizophrenia while in the custody of the Missouri Department of Public Health in 2002. His mental illness causes him to suffer recurrent, severe, and highly disturbing mental health issues including periods of severe psychotic disease in which he is unable to distinguish what is real and what is not. Plaintiff's physicians prescribed several medications after he first developed symptoms in 1995. After plaintiff's physician tried multiple treatment options, plaintiff was prescribed Clozapine from 1995 until 2007. Clozapine's side effects can be severe, so it is only used when other treatments have failed. When the side effects (in this case, low white blood cell count) from Clozapine became too dangerous to continue in 2007, plaintiff tried

several other medications.  When those drugs were unsuccessful, plaintiff's psychiatrist prescribed Geodon.  Plaintiff alleges he was treated successfully on Geodon from 2007 to 2013.

Plaintiff was incarcerated at Potosi Correctional Center in 2013, when he stopped taking Geodon.  Plaintiff testified the prison discontinued Geodon because it was too expensive, but defendants cite medical records showing that plaintiff voluntarily discontinued Geodon because his mental health had improved.

In September 2014, defendant Corizon entered into a contract with MDOC to provide mental health services to MDOC prisoners, replacing another company that had done so before.  Plaintiff was transferred to SECC on December 16, 2014, where defendant Cynthia Reese was employed by Corizon as the Institutional Chief of Mental Health Services.  Defendant Reese is a Licensed Professional Counselor.  During the relevant time, non-party Dr. Shirley Eyman, a psychiatrist, was Corizon's Director of Psychiatry for the Missouri region.

Plaintiff enrolled in the mental health chronic care clinic upon arriving at SECC, but he refused to be seen for at least one mental health care visit because he said he was not suicidal or homicidal and had no complaints.  Plaintiff saw non-party psychiatrist Dr. Donna Gowin on December 24, 2014.  Plaintiff reported he was off his medications.  Dr. Gowin spent an hour reviewing plaintiff's file before his appointment and then another hour with plaintiff at his appointment.  She requested that plaintiff be put on Geodon again, a request that required approval from Dr. Eyman because Geodon was then a "non-

formulary" medication, meaning it was not on the list of presumptively-allowed medications.

Dr. Eyman did not approve the request. The parties dispute Eyman's reasons. Plaintiff says he was told Eyman did not approve Geodon because it was too expensive. Defendants state that Eyman wanted plaintiff to first use other, untried formulary antipsychotic medications, such as loxapine. Plaintiff notes that Dr. Eyman did not confirm whether plaintiff had tried other medications prior to Geodon, nor did she follow up to determine whether plaintiff had been prescribed a formulary medication.

A week after Dr. Gowin told plaintiff she would request Geodon, around December 31, 2014, plaintiff filed a Health Services Request ("HSR") inquiring about when he would receive the medication. Plaintiff filed additional HSRs on January 8 and 14, 2015 with the same question. Corizon has no policy or procedure in place for notifying inmates when non-formulary requests are denied. Defendant Reese testified that informing inmates that non-formulary medication requests had been denied was "between the psychiatrist and the patient." Reese met with plaintiff on January 16, 2015, and they discussed the fact that the Geodon had not been approved (plaintiff and Reese dispute whether plaintiff already knew this).

On January 22, plaintiff had another appointment with Dr. Gowin. She told him the Geodon had been denied. Although plaintiff denies that Dr. Gowin recommended alternative formulary medications or that he refused them, the medical record notes say that the Geodon and Clonazepam "were not approved" and "he refuses to go to other meds."

On February 9, SECC staff found plaintiff in his cell, biting at his arm so hard that he caused bleeding. He told them he was biting his arm because there was a tracking or homing device in it. As a result, Dr. Gowin told plaintiff she wanted to try him on medications, and plaintiff agreed to try loxapine, which was a formulary antipsychotic medication.

Plaintiff testified that the loxapine made him feel somewhat better, but he slept so much he would miss meals, was not social, and experienced side effects including constipation and shaky limbs. Plaintiff also alleges that the prison intermittently failed to provide plaintiff with loxapine because the prison pharmacy would run out for days at a time. This occurred in April 2015 and August 2015.

By October 2015, plaintiff's condition had deteriorated to the point that Dr. Gowin feared he was heading for a psychotic break. She re-submitted a non-formulary request for Geodon, and Corizon approved the request.

Corizon, which has had the mental health services contract for MDOC since September 2014, receives a fix dollar amount per inmate, per day. From that revenue, Corizon is responsible for paying all its expenses, including medical staff, supplies, outside medical providers, and medication.

## B.    Anal Fistula Allegations[1]

Plaintiff had a colonoscopy on November 10, 2014, while still at Potosi Correctional Center.  Following the colonoscopy, a lump developed near his anus.  On November 19, he saw on-call nurses who noted a lump under the skin near his anus.  The nurses told plaintiff it "looked like a boil" caused by an ingrown hair and would eventually pop.  Plaintiff also saw defendant Dr. McKinney on November 19 for lumbar-sacral pain and for follow-up regarding the negative colonoscopy results.  On November 20, plaintiff saw McKinney again for chronic care appointments to monitor plaintiff's hepatitis and hypertension.

Plaintiff sought a follow-up to his November 19 appointment on November 22 and was seen by non-party nurses on November 23.  Although plaintiff told the nurses that he could feel the lump, the nurses could not see a bump, lesion, or tear.  He was told to return if his symptoms worsened.

Plaintiff complained that he was not receiving treatment for the lump, and his attorney sent a letter to that effect on November 25.  Plaintiff was then seen on November 29 by non-party nurse Karol Clossom, who noted a 2-3 cm hard, palpable knot at the edge of plaintiff's anal sphincter.  She stated in the note that the knot appeared to be a

---

[1] The Court notes that defendants' statement of facts (#163) is formatted in a way that is very difficult to follow.  Although the document's paragraphs are numbered as required by the local rules, some numbered paragraphs often include 50 or more lettered sub-paragraphs that go on for many pages.  This makes it very difficult for the Court to locate specific paragraphs cited by the parties in the briefing because it is time consuming to determine which numbered paragraph a given page of lettered sub-paragraphs belongs to.  Making matters worse, many of the subparagraphs are further divided into numbered sub-subparagraphs.  The Court hopes counsel will take note of this and, in the future, avoid the use of sub-paragraphs.  Instead, counsel may use subject headings if they wish to group certain statements of facts.

possible boil or abscess trying to present itself, so she gave him a 30-day supply of Tylenol 325 and referred plaintiff back to Dr. McKinney.

Plaintiff saw Dr. McKinney again on December 3. McKinney noted that there was a 1.5 by 0.5 cm area of raised induration, but that plaintiff had reported it had improved and did not interfere with his normal activities, so he believed it was not indicative of an abscess. McKinney told plaintiff to follow up with medical if needed.

Plaintiff filed an Informal Resolution Request ("IRR") on December 8, noting that he was still in pain and that no one had determined what the swelling was, and he requested further medical treatment. Defendant McKinney had no further contact with plaintiff because plaintiff was transferred to SECC on December 16.

On January 31, 2015, he reported to Corizon in a grievance that his condition was worse and he was in pain. On March 14 or 16, plaintiff self-declared a medical emergency. The nurse noted a hardened, flesh-colored nodule but did not see any drainage. No treatment was provided, but plaintiff was instructed to return if the symptoms worsened. Plaintiff filed an IRR on March 17 related to that appointment and wanted the medical department's practices investigated. The Director of Nursing did not receive the IRR until March 30. On April 1, he sent a letter about this matter to defendant Juden, the Health Services Administrator for SECC. Defendant Juden responded on April 7 and explained that he should have been giving his Health Services Requests ("HSRs") directly to nurse sick-call. Plaintiff submitted an HSR at sick call and was seen by non-party nurse James Hartline on April 9. The examination showed a small

mass outside the rectum without signs of infection, and plaintiff denied any tenderness. Nurse Hartline referred plaintiff to doctor sick-call for evaluation.

On April 13, 2015, plaintiff was seen by defendant Nurse Practitioner ("NP") Hill for chronic care clinics to monitor hepatitis and hypertension. Plaintiff was seen by non-party nurse practitioner Rebekah Graham and requested a rectal exam; he complained that the loxapine had caused constipation and acid reflux.

Plaintiff was seen by defendant Dr. Eppolito at doctor sick-call on April 19 for the lump. Defendant Eppolito determined the mass was a small internal hemorrhoid and reassured plaintiff, telling him to return if he had any concerns. Plaintiff submitted an HSR to defendant Eppolito on April 27, complaining of persistent swelling. He was seen by non-party nurse Tasha Boyd, who referred him to doctor sick-call. Plaintiff filed another IRR on the same day, complaining of being subjected to a humiliating exam in front of a female nurse and that the examination room was unsanitary because it contained cleaning supplies.

On April 30, defendant nurse practitioner Hill saw plaintiff at doctor sick-call. She diagnosed the mass as an abscess and prescribed antibiotics for ten days.

On May 8, the Director of Nursing responded to the March 17 IRR that the issue had been addressed.

On May 11, plaintiff submitted an HSR to defendant Hill about his rectal swelling. The Director of Nursing received the April 27 IRR on May 12. Plaintiff sent a letter to defendant Juden regarding his two different diagnoses and requesting immediate examination. He sent another letter to Juden on May 24.

On May 25, plaintiff self-declared another medical emergency. He complained of pain and swelling but said it was not an abscess. Non-party nurse Boyd determined it was not an emergency and told plaintiff to return to medical if symptoms worsened. Plaintiff sent an HSR to defendant Juden and said he wanted to be examined by outside medical "advisors." He explained that he had been experiencing pain and swelling for six months and that the antibiotics had been ineffective. Plaintiff was seen in nurse sick-call by Nurse Boyd. Nurse Boyd referred plaintiff to doctor sick-call.

On May 27, the Director of Nursing responded to the April 27 IRR (which had been received May 12) and stated the issue had been addressed with the nurse on duty and the IRR could not be supported at that time.

On May 28, plaintiff complained of severe constipation and saw defendant Dr. Eppolito. Plaintiff denies that Eppolito knew plaintiff complained of constipation, however. Eppolito again determined plaintiff's problem was a hemorrhoid and prescribed him hemorrhoidal ointment. Eppolito recalls showing plaintiff photos of internal hemorrhoids on the computer and explaining why he thought plaintiff had an internal hemorrhoid.

Plaintiff filed a Grievance regarding the denial of the March 17 IRR on June 4.

On June 5, plaintiff was seen at nurse sick-call by Nurse Boyd. He complained that he had been given the wrong ointment, and it was determined that the ointment shipped to SECC and given to plaintiff was not hemorrhoidal ointment. Boyd discussed the matter with the Director of Nursing to obtain the correct ointment for plaintiff.

Plaintiff filed a Grievance regarding the denial of the April 27 IRR on June 9.

Defendant HSA Juden received the Grievance about the March 17 IRR on June 9.

Plaintiff filed a new IRR on June 15, and it was received by the Director of Nursing on June 18.

Defendant HSA Juden received the Grievance about the April 27 IRR on June 22.

At a July 9 nurse sick-call, plaintiff complained of swelling and requested an x-ray. Nurse Boyd referred plaintiff to doctor sick-call. Plaintiff submitted an HSR on July 23 requested an x-ray and to see a doctor. On July 24, plaintiff was again seen at nurse sick-call by Nurse Boyd, who noted plaintiff wanted an x-ray and to be seen by a doctor, and that plaintiff was referred to a doctor on July 9 and was awaiting an appointment.

On July 24, defendant Juden responded to plaintiff's Grievance regarding the March 17 IRR. She responded that the matter was reviewed and investigated, that the records did not indicate his vital signs being taken on March 16, and that she had spoken with both staff members and they had denied knowledge of the incident.

Defendant NP Hill reviewed plaintiff's medical chart on July 28. She noted that an appointment was not needed and an x-ray would not be useful under the circumstances and that plaintiff was advised he did not have cancer, despite his concerns. She also told plaintiff that he should submit an HSR if he developed symptoms of infections such as draining, reddening of the skin, pustule formation, fever, or pain.

On July 31, plaintiff filed an IRR complaining he believed medical was intentionally ignoring his request to be seen by a doctor.

Defendant Juden responded to plaintiff's grievance regarding the April 27 IRR on August 24. She noted that the examination room for nurse sick-call was suitable and

proper, and that SECC administration made the decision to use the room for the sake of safety and security.

Plaintiff submitted another HSR on August 27. He was seen in nurse sick-call by Nurse Boyd, who noted that plaintiff complained he had been referred to a doctor on July 9 and 24, but that he had not seen one. Boyd told him that, per NP Hill's chart review on July 28, an x-ray was unnecessary.

On September 18, plaintiff filed a Grievance regarding the July 31 IRR. Defendant Juden received the Grievance on October 2.

The Director of Nursing responded to plaintiff's Grievance regarding the June 15 IRR. She noted that he had been seen by the provider and was given medications for his complaints.

On October 5, plaintiff submitted an HSR to see NP Hill. He was seen by Hill in the hepatitis and cardiovascular chronic care clinics on October 9, and she noted he was concerned about the lesion adjacent to his anus. NP Hill requested Dr. Eppolito to examine the lesion, and he assessed the lesion as either a sebaceous or pilonidal cyst. It was determined that an appointment would be made for plaintiff to see Dr. Eppolito in two to three weeks for excision of the cyst.

Defendant Juden responded to plaintiff's Grievance regarding the July 31 IRR that he had been seen by Dr. Eppolito and would be scheduled for excision soon.

Plaintiff filed a Grievance regarding the June 15 IRR on October 26.

On October 29, plaintiff was seen by Dr. Eppolito in doctor sick-call complaining of an infection in the groin area. Dr. Eppolito assessed that the cyst appeared to be a

questionable resolved abscess and that he would recheck the cyst if it was again inflamed. Eppolito testified that he did not perform an I&D on the cyst because it was indurated and there was nothing to "really open."

On October 30, defendant Juden received plaintiff's Grievance regarding the June 15 IRR.

On November 5, plaintiff was transferred from SECC to ERDCC.

Defendant Juden responded to the June 15 IRR Grievance on December 24 summarizing the recent treatment history. She concluded that the medical provider had assessed the area and noted it had resolved and no further treatment was needed.

On December 21, plaintiff was seen by a nurse at ERDCC for a "spot" that had been hurting for "a couple of days." She noted that the nodule was on the right inner buttock with a "boggy center soft yellow or white head present" and was draining. The notes said plaintiff would be started on an antibiotic. On December 22, plaintiff was seen by the same nurse who wrote that the wound was "red and draining" but that there was no sign of infection. Plaintiff saw the same nurse against December 23 and 24 with similar notations. On December 25, plaintiff saw a different nurse and reported that the wound felt better. By December 28, plaintiff was seen by a third nurse, who wrote that the area was no longer open and draining and that dressing changes were no longer needed.

On January 7, 2016 plaintiff saw the third nurse again and inquired about treatment of what the notes called a "boil." He was scheduled to see another nurse in the morning. On January 8, he was seen by nurse Heather Naeger. He advised her that the drainage had stopped but a large knot remained. There was a raised, indurated area

approximately 2.5 cm in diameter, and no drainage was present.  Nurse Naeger prescribed an antibiotic.

On January 20, plaintiff self-declared a medical emergency and was seen by another nurse, who noted a 3 cm induration with tracking that was very hard to palpation.  The nurse was able to express a scant amount of brownish drainage, and she called Dr. Richards and a nurse practitioner, Shannon Oaks, to assess plaintiff.  NP Oaks noted she suspected a possible fistula and placed a referral for plaintiff to be seen by a colorectal surgeon.  The referral was approved on January 22.  Plaintiff was seen by a colorectal surgeon, Dr. Roberts, on February 9, 2016.  Dr. Roberts recommended surgery, and at least one fistulotomy was performed, after which plaintiff's symptoms resolved.

### C.     Allegations Against Missouri Employees

Plaintiff and his then-attorney sent letters and other communications complaining about plaintiff's medical care to MDOC officials including defendants Wallace and Steele.  Plaintiff alleges that Wallace and Steele never personally responded to the communications, but that Wallace referred the communications he received to others.  Plaintiff alleges Lombardi was responsible for removing plaintiff's access to Geodon in 2013 because it was too expensive.  Plaintiff alleges defendants Precythe, Steele, Wallace, and Lombardi instituted a policy limiting medical appointments to 15 minutes and separating medical and mental health departments.  Plaintiff alleges that defendant corrections officer David Null threated plaintiff with his gun and pushed the gun into plaintiff's side during one of his medical visits.  Finally, plaintiff alleges he has sought but has not had a full mental health or physical performed since 2007.

### D.    This Litigation

Plaintiff filed his pro se complaint in this Court on July 31, 2015. This Court appointed counsel for plaintiff. Plaintiff's Third Amended Complaint (#126)—the operative complaint in this litigation—brings four counts against the defendants.

Count I is against Corizon, Lombardi, Precythe, Reese, Wallace, and Steele for failure to provide medical care with respect to plaintiff's mental health diagnosis including (1) failing to provide plaintiff with Geodon because it was too expensive, (2) failing to maintain stock of the medication they would allow, and (3) instituting a policy of limiting medical appointments to 15 minutes and separating medical and mental health records.

Count II is against defendants Corizon, Eppolito, Hill, Juden, McKinney, Wallace, Steele, Lombardi, and Null for failure to properly treat plaintiff's anal fistula.

Count III is a state law battery claim against defendant Null for threatening plaintiff with a gun and pushing the gun into plaintiff's side during an appointment.

Count IV seeks an injunction requiring that defendants Precythe, Stringer, and Corizon provide adequate medical care and treatment to plaintiff Harris and requiring them to order a complete physical and mental health screening for plaintiff.

## II.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467

(1962). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

## III.    Discussion

Plaintiff's four counts include two claims for failure to provide medical care in violation of plaintiff's Constitutional rights (Counts I and II), one state law battery claim (Count III), and one claim seeking an injunction (Count IV).  Defendants do not seek summary judgment on Count III.  Only two defendants appear to seek summary judgment on Count IV.

Plaintiff brings Counts I and II under 42 U.S.C. § 1983 for civil rights violations under the Eighth and Fourteenth Amendments.  To establish a such a violation regarding

medical care, plaintiff must show defendant was deliberately indifferent to the plaintiff's serious medical needs. *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009). "Deliberate indifference has both an objective and a subjective component." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). The objective component requires a plaintiff to demonstrate an objectively serious medical need. *Grayson v. Ross*, 454 F.3d 802, 808–09 (8th Cir. 2006). No one disputes that plaintiff's mental diagnoses constitute serious medical needs. A "serious medical need" is one "that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d. 778, 784 (8th Cir. 1997) (quoting *Camberos v. Branstad*, 73 F.3d. 174, 176 (8th Cir. 1995) ).

In order to satisfy the subjective component of an Eighth Amendment medical claim, a plaintiff inmate must show the defendant knew of, yet deliberately disregarded, an excessive risk to the inmate's health. *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997). A prison official may be liable under the Eighth Amendment if he knows that an inmate faces a substantial risk of serious harm and fails "to take reasonable measures to abate it." *Coleman*, 114 F.3d. at 785 (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). The plaintiff must establish a "mental state akin to criminal recklessness." *Vaughn*, 557 F.3d at 908 (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). "Neither differences of opinion nor medical malpractice state an actionable Constitutional violation." *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002).

## A.     Defendants Cynthia Reese and Corizon

Defendants Cynthia Reese, the chief of mental health at SECC, and her employer, Corizon, are both named as defendants in Count I for deliberate indifference related to plaintiff's mental health.

First, the Court addresses plaintiff's claim regarding the denial of Geodon.  The Third Amended Complaint's Count I states that defendants "Corizon, Reese, and Lombardi removed Mr. Harris from Geodon because the drug was too expensive." (#126 at ¶69.)[2]  Plaintiff stopped taking Geodon in 2013, and although plaintiff disputes defendants' contention that plaintiff himself chose to discontinue the Geodon, neither Corizon nor Reese could have been responsible.  Corizon was not contracted to MDOC for mental health services until 2014, and Reese worked at SECC and was not involved with plaintiff's treatment until he arrived at SECC in December 2014.

As for claims against defendant Reese, plaintiff argues that she knew plaintiff was not getting the medication he needed to treat his serious medical need, but she did nothing.  Reese responds that she could not prescribe medication and that her job was largely administrative.  Although she reviewed and responded to grievances (including grievances plaintiff submitted regarding his Geodon request), the grievances were ultimately appealed and handled by Dr. Eyman.  Plaintiff does not cite to any evidence sufficient to show that Reese had responsibility for supplying him with a particular medication.  To the extent defendant Reese could be charged with failing to act to ensure

---

[2] Defendant Lombardi is addressed with the state defendants' motion, below.

plaintiff was receiving medication for his schizophrenia in early 2015, it is clear that her acts amount at most to a delay in treatment. Reese met with plaintiff on January 16, 2015, and she referred plaintiff to the psychiatrist, whom he was seeing the next week. When an "inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (internal quotation omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (internal quotation omitted). Plaintiff sets forth no evidence showing that the delay in resuming plaintiff's anti-psychotic medication had any detrimental effect. Notably, plaintiff's psychiatrist appears to have offered plaintiff alternative medications at the January 22 appointment, but plaintiff declined those medications until after he hurt his arm on February 9. Plaintiff did not like the formulary medication he was offered— loxapine—but he agreed to take it, and just nine days later the psychiatrist saw him again and reported that plaintiff's symptoms had improved. It is well-settled that "inmates have no constitutional right to receive a particular or requested course of treatment." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). This Court holds that defendant Reese was not deliberately indifferent to plaintiff's serious medical needs.

Plaintiff appears to claim that Corizon was responsible for the pharmacy's failure to provide him with loxapine for several days in April and August. Corizon may be held liable for a § 1983 violation if it had a custom, policy, or practice that was the "moving

force" behind the constitutional violation. *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016). Corizon explained that any lapses in pharmacy stocking resulted from an unexpected increase in offenders' use of loxapine. Although plaintiff states that this actually resulted from Corizon's lack of a policy or system to make sure its pharmacy was sufficiently stocked, plaintiff has no support for this statement. (Plaintiff cites to Dr. Eyman's deposition, but the deposition pages in the Exhibit do not reflect any such testimony, and defendants deny that she proffered any such testimony.) Regardless, the Court agrees that, to the extent plaintiff was temporarily without his medication, he does not cite to any harm arising from the delay, and it appears that the isolated incidents amount to no more than negligence—not deliberate indifference.[3]

After plaintiff tried loxapine from February through October, and after his symptoms worsened, plaintiff's psychiatrist against requested that Corizon allow her to prescribe Geodon. This time, Dr. Eyman granted the request. Plaintiff argues that this delay in receiving his requested medication amounted to deliberate indifference by Corizon as well, and he points to the company's formulary-drug policy as the moving force behind the violation. Indeed, Corizon appears to admit that it wants inmates to use formulary medications rather than (presumably more expensive) non-formulary drugs, so Dr. Eyman wanted plaintiff to try a formulary drug first. Plaintiff suggests that this was

---

[3] This is not the first lawsuit plaintiff has brought regarding lapses in access to medication. In *Harris ex rel. Hudson v. Kempker*, 1:05CV217 SNLJ, 2009 WL 749573, at *7 (E.D. Mo. Mar. 19, 2009), this Court held that defendant Correctional Medical Services ("CMS," a predecessor to Corizon) could be held liable for lapses in providing medication even though the lapses were caused by plaintiff's failure to report to the clinic for lab work that was required to maintain his prescription. This Court held that the record called into question whether plaintiff was adequately able to attend to his own medical care and that, if CMS were aware and made no effort to alter the method by which plaintiff received care, then it may have demonstrated a pattern of deliberate indifference. *Id.* The circumstances alleged here are distinguishable.

unreasonable because plaintiff had spent years trying other drugs in the past and that only Geodon had been suitable.  Although plaintiff disagrees with the policy and the decision, it does not rise to deliberate indifference.  In particular, the Court notes that (1) it had been some time since plaintiff had tried other medications, (2) plaintiff was entirely unmedicated for more than a year without complaint, and (3) after plaintiff tried and failed treatment on loxapine, Dr. Eyman approved Geodon.  This does not constitute deliberate indifference.  Although plaintiff began to suffer adverse side effects from loxapine, plaintiff's psychiatrist continued to monitor plaintiff, and, as it became clear that his condition was worsening, she requested a change to Geodon.  Again, although the medical treatment may not have been ideal, the Constitution does not guarantee ideal medical treatment.

Plaintiff also argues that Corizon had no policy to ensure it provided plaintiff with medication without side effects that would conflict with his other medical problems. Plaintiff suggests that because he was experiencing painful swelling in his rectal area that turned out to be an abscess, he should not have been prescribed loxapine, which is known to cause constipation.  Defendants assert, in contrast, that constipation is an "infrequently" known side effect of loxapine.  Plaintiff contends that because Corizon does not make inmates' medical (i.e., non-mental-health) records available to mental health staff, medical/mental health staff have incomplete information which results in alleged mistakes like prescribing plaintiff constipating mental health medication. Plaintiff, however, does not appear to have support for the existence of any policy of keeping records separate; defendants deny that Dr. Eyman so testified, and the Court's

reading of her deposition yields no such statement. Dr. Eyman said that she (as a non-treating physician) would have had no way of knowing that plaintiff had rectal problems. That is not the same as stating that treating staff had no such access to medical files.

Finally, plaintiff claims Corizon had a policy of limiting appointments to 15 minutes. Defendants point out in their memorandum that this allegation is belied by plaintiff's own records, which show that at least eight of plaintiff's own visits lasted longer than 15 minutes. Indeed, plaintiff's first visit with Dr. Gowin was 60 minutes long. Plaintiff does not appear to address this matter in his response memorandum, and thus the Court presumes he has abandoned this claim.

Summary judgment will be granted to defendants Reese and Corizon on Count I.

## B. Defendants McKinney, Hill, Juden, and Eppolito

In Count II, Plaintiff claims that defendants McKinney, Hill, Juden, and Eppolito were deliberately indifferent to an abscess that became an anal fistula. Even if plaintiff received ineffective and inadequate medical care, the Court is mindful that negligence or malpractice do not by themselves rise to a constitutional violation. *Jones*, 310 F.3d at 612. Plaintiff must show that he suffered from an objectively serious medical condition, and that defendant knew of, yet deliberately disregarded, an excessive risk to the inmate's health. *Keeper*, 130 F.3d at 1314.

### 1. Dr. McKinney

Defendant Dr. McKinney is a Corizon-employed physician at Potosi Correctional Center. McKinney saw plaintiff on November 19, 2014 regarding "lumbar-sacral pain" and again for liver and heart-related appointments on November 20. Plaintiff saw

McKinney again on December 3, at which they discussed the lump near his anus. McKinney noted that there was a 1.5 cm by 0.5 cm raised area, but he also noted that plaintiff reported his symptoms had improved and that it was "not suggestive of abscess given improvement and limited tenderness." McKinney advised plaintiff that he should follow-up if symptoms increased. Plaintiff was transferred from PCC to SECC on December 16, so he did not see McKinney again.

Plaintiff argues that McKinney should have assumed that plaintiff had an abscess and prescribed antibiotics and that, in not so-doing, McKinney was deliberately indifferent. Assuming for the sake of argument that plaintiff, at that time, was suffering from an objectively serious medical condition, it is apparent that McKinney did not know of and deliberately disregard an excessive risk to plaintiff's health. He exercised his medical judgment based on the patient's history and determined that the circumstances indicated there was no abscess because symptoms had improved. Even if incorrect— even if malpractice—McKinney's treatment does not approach deliberate indifference. No evidence suggests McKinney deliberately disregarded any risk to plaintiff's health. Although plaintiff faults McKinney for not reading his earlier medical records, it is clear from the notes that McKinney took a history from plaintiff and considered plaintiff's changing symptoms. Summary judgment will be granted to defendant Dr. McKinney.

### 2. Nurse Practitioner Hill

Defendant Hill is a nurse practitioner at SECC. She saw plaintiff on April 30, 2015 and diagnosed plaintiff with an abscess. She prescribed a 10-day course of antibiotics. Then, she conducted a medical records review on July 28, likely in response

to a grievance, and she noted that plaintiff did not need an x-ray or appointment under the circumstances. She did not see plaintiff in person again until October 9 at a chronic care appointment for plaintiff's liver and heart conditions. At that appointment, plaintiff told her he was concerned about the "lesion" adjacent to his anus, and NP Hill called Dr. Eppolito in to examine it. At that time, Dr. Eppolito diagnosed plaintiff with either a sebaceous or pilonidal cyst, and Hill writes a note that plaintiff should be scheduled for excision of the cyst.

Plaintiff contends that Hill was deliberately indifferent because she knew he had an abscess on April 30 and prescribed antibiotics, but then she did nothing to ensure that the treatment was successful. Although it is unclear what role Hill had in ensuring plaintiff followed up after the course of antibiotics, she did review his records on July 28, and extensive notes of that review appear in plaintiff's medical records. She wrote that he was given antibiotics on April 30 and that there was a "firm central white nodule consistent with a sebaceous cyst that was flaring," and then her next note is that on July 9 he wanted an x-ray and a doctor appointment. Hill wrote "appointment not needed – x-ray won't show swelling" and then "offender is concerned he has cancer at the right buttock" and that she "tried to explain to offender he doesn't have cancer."

She then writes that plaintiff does not have trouble with bowel movements or drainage. She states "this is a chronic issue—will be medically treated when and if has developed further symptoms—will get better, will get worse, but due to location, would be most difficult to maintain any sterile field to try to excise area and due to location risks of infection would be extremely high." Her assessment is "[history] of abscess formation

d/t chronic sebaceous cyst located in extreme right medial buttock fold adjacent to anus." She also states a plan: "if develops symptoms of infection, i.e., drainage, erythema, pustule formation and/or rupture of pustule, fever, pain, then would be appropriate to submit HSR for evaluation." Notably, the medical records also show that Hill relayed to plaintiff on May 26 (through a nurse) that the antibiotics were to make sure he did not develop an infection, and that the swelling may or may not go away.

It is apparent from the medical records that plaintiff's symptoms waxed and waned. Plaintiff's expert agreed that plaintiff went months at a time without complaint. Although plaintiff suggests that Hill should have done something further after prescribing antibiotics in April, plaintiff's expert states that Hill correctly diagnosed the abscess at that time and correctly prescribed antibiotics. However, plaintiff's expert opines that plaintiff should have been referred to a colorectal surgeon no later than six months from his initial presentation, immediately after the courses of antibiotics failed to resolve the abscess.

Ultimately, although it is unclear what role NP Hill had immediately following the course of antibiotics, she believed that the abscess was a cyst whose symptoms would wax and wane. The medical records show she believed the antibiotics were given to prevent an infection. She weighed the risks and benefits of further intervention and determined that, under the circumstances, further intervention was not appropriate. Although there is evidence that Hill should have referred plaintiff to a surgeon, this is, again, at most negligence and not deliberate indifference.

### 3.  Dr. Eppolito

Defendant Dr. Eppolito first saw plaintiff on April 19 and diagnosed plaintiff with an internal hemorrhoid.  On May 28, plaintiff saw Eppolito again, and again Eppolito told plaintiff he had a hemorrhoid and prescribed ointment.  Eppolito testified that he showed plaintiff photos of internal hemorrhoids to explain why he thought he had a hemorrhoid because Eppolito had talked to NP Hill about plaintiff's anxiety about the matter. Eppolito did not determine that the mass was not a hemorrhoid until October, when Hill brought him into the exam room to examine the lesion. At that time, on October 9, the lesion was draining clear fluid, and Eppolito determined that it was a cyst.  He planned to see plaintiff in two to three weeks to excise the cyst.  But, when plaintiff returned on October 29, the lesion was firm and not draining and there was "nothing really to open." He believed that "if you try to open it, it just causes pain" and "doesn't do anything to help it."

Plaintiff argues that Eppolito was deliberately indifferent because his notes were brief and because he had not conducted a review of plaintiff's medical records before treating him.  Plaintiff also points out that defendants' own expert opined that Eppolito could not have properly diagnosed an internal hemorrhoid by "feeling it."  However, this is at most a misdiagnosis and medical malpractice.  Plaintiff makes much of the fact that he sent strongly-worded Health Services Requests to providers Eppolito and Hill explaining his concerns, but HSRs are not given to providers.  When plaintiff did see Eppolito, Eppolito explained his findings and eventually concluded that what he thought was a hemorrhoid was in fact a cyst.  Both diagnoses may have been wrong, but, again,

negligence is not deliberate indifference. Plaintiff states that it is difficult to imagine circumstances that would support a finding of deliberate indifference if these do not, but these events do not rise to that level. The evidence shows that Eppolito was not deliberately indifferent. He examined plaintiff and took the time to explain his diagnosis, treating his symptoms in what he believed was an appropriate manner. Eppolito and Hill even consulted each other about plaintiff's problem, and they both—albeit wrongly—determined that plaintiff's problem did not require further intervention given its waxing and waning symptoms.

Summary judgment will be granted to defendant Dr. Eppolito.

### 4. Health Services Administrator Juden

Plaintiff sent letters to the SECC Health Services Administrator defendant Juden, and he also filed IRRs and Grievances that were handled by Juden. As an administrator, Juden does not conduct physical examinations of plaintiff. Plaintiff argues that Juden, with the information provided to her in the letters and formal complaints, should have ensured he received proper medical care.

As Juden explained in her responses to plaintiff, she reviewed and investigated the relevant IRRs and/or Grievances and determined that his treatment had been adequate. There is no evidence that defendant Juden was deliberately indifferent to plaintiff's serious medical needs, and summary judgment will be granted.

### 5. Corizon

Finally, plaintiff contends that Corizon had three "policies of omission" that caused plaintiff to receive constitutionally inadequate medical care. As already noted,

Corizon may be held liable for a § 1983 violation if it had a custom, policy, or practice that was the "moving force" behind the constitutional violation. *Schaffer*, 842 F.3d at 596. This Court has held that no constitutional violation occurred. As a result, summary judgment is granted to Corizon on Count II.

### C.    Defendants Lombardi, Precythe, Steele, Wallace, Null, and Stringer

The State defendants are or were employees of the Missouri Department of Corrections (Lombardi, Precythe, Steele, Wallace, and Null) or the Missouri Department of Mental Health (Stringer). These defendants moved for summary judgment as to Counts I, II, and IV.

### 1.    Official-capacity claims against Null

Plaintiff brings his claims against defendant Null in his individual and official capacities. Defendant Null moved for summary judgment as to claims against him in his official capacity, and plaintiff did not oppose the motion on those grounds. Summary judgment will thus be granted to defendant Null as to claims against him in his official capacity.

### 2.    Stringer, Lombardi, and Precythe

Plaintiff also does not contest that defendants Stringer, Lombardi, and Precythe are entitled to summary judgment as to the claims against them in their individual capacities. As a result, the Court will grant summary judgment to defendants Stringer, Lombardi, and Precythe as to Counts I, II, and IV.

### 3.    Defendants Steele and Wallace

Plaintiff claims defendants Steele and Wallace were deliberately indifferent to plaintiff's serious medical needs because they knew about his healthcare complaints and did nothing to address them. Defendants Steele and Wallace were, at relevant times, the wardens PCC and SECC, respectively.

Defendant Steele received a letter from plaintiff's then-attorney in 2014 regarding complications following plaintiff's colonoscopy. He turned the letter over to PCC's litigation coordinator.

Defendant Wallace has known plaintiff for 20 years, starting when Wallace was plaintiff's caseworker. While working on the walkway at SECC, plaintiff recognized Wallace (who was by then the Warden at SECC) as his former caseworker, and plaintiff told Wallace about his medical problems. Defendant Wallace advised plaintiff to write to him and, on one occasion, told plaintiff to file IRRs. Plaintiff wrote a letter to defendant Wallace, and although it was received by Wallace's office, plaintiff did not receive a response. Wallace referred another letter to his deputy warden, who responded for Wallace and stated that although he could not intervene with respect to plaintiff's healthcare, he would forward plaintiff's concerns to defendant Juden. Plaintiff alleges he did not otherwise receive a response.

To the extent plaintiff claims that the defendants Steele and Wallace are liable merely because they are wardens of their respective prisons, such a respondeat superior claim is not cognizable under § 1983. *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir.

1987).  "Further, a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement" required for a § 1983 claim.  *Id.*

As for plaintiff's claims that Steele and Wallace did exhibit the sort of personal involvement required for a § 1983 claim, neither Steele nor Wallace were involved in any decisions regarding plaintiff's medical care.  To the extent that they knew of a serious risk to plaintiff's health, plaintiff has not shown that they deliberately disregarded the risk.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (internal quotations omitted).  Both Steele and Wallace responded reasonably to the communications they received—in both cases, they referred the communication to someone else, and, in Wallace's case, he advised plaintiff to file an IRR.  It is undisputed that neither Steele nor Wallace were in any position to command any medical staff to take any particular action.  Plaintiff has set forth no evidence showing that either Steele or Wallace were deliberately indifferent to plaintiff.  Regardless, as this Court held, there was no constitutional violation in the first place.

## IV.    Conclusion

Summary judgment will be granted to defendants on Count I, to defendants Corizon, Eppolito, Hill, Juden, McKinney, Wallace, Steele, and Lombardi on Count II, and to defendants Stringer and Precythe on Count IV.

Remaining claims—those that were not challenged on summary judgment—are Counts II and III against defendant Null and Count IV against Corizon. The parties will

be ordered to submit briefing on the remaining claims in light of this Court's decisions by March 18, 2020.

Finally, the Court notes that plaintiff's appointed counsel has done commendable work marshalling the voluminous record and representing their client's interests. The Court appreciates counsels' efforts.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motions for summary judgment and partial summary judgment (#161, #166, #171) are GRANTED.

**IT IS FURTHER ORDERED** that, by March 18, 2020, the parties shall file simultaneous briefing regarding the remaining claims in light of this Court's decision.

Dated this  13th  day of March, 2020.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE